Mrs. Shirley E. STANLEY et al.,
Plaintiffs,

v.

Otis L. BROWN, etc., et al., Defendants.

Civ. A. No. 69–C–108–R.

United States District Court,
W. D. Virginia,
at Roanoke.

May 25, 1970.

John J. Beal, Jr., Ralph W. Buxton, John M. Levy, Roanoke, Va., for plaintiffs.

Andrew P. Miller, Atty. Gen. of Virginia, Anthony F. Troy, Asst. Atty. Gen., Richmond, Va., for defendants.

Before BUTZNER, Circuit Judge, DALTON, Chief District Judge, and WIDENER, District Judge.

BUTZNER, Circuit Judge:

Shirley E. Stanley and Gloria R. Terry, and their dependent children, bring this class action before a three-judge court convened pursuant to 28 U.S.C. § 2281 to enjoin officials of the Virginia Department of Welfare and Institutions from enforcing regulations which place a ceiling on grants to families receiving aid for dependent children. The plaintiffs also ask that the defendants be required to increase retroactively the standard utility allowance to reflect changes in the cost of living. We dismiss both claims.

I.

Virginia currently limits payments for Aid to Families with Dependent Children (AFDC) to a maximum of $280 per month for each family. The state calculates the amount of a grant on the basis of the number of persons in a family up to six, and makes no additional payment to a larger family. Approximately 17% of the families receiving AFDC grants are affected by the maximum.

Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), which was decided while this case was pending, holds that a Maryland regulation imposing a ceiling on grants does not violate either the Equal Protection Clause or the Social Security Act of 1935.[1] The Maryland regulation is substantially similar to Virginia's, and *Dandridge*, therefore, disposes of all but one of the issues raised by the plaintiffs.

In *Dandridge*, the Court cautioned [397 U.S. at 485 n. 17, 90 S.Ct. at 1162]:

"It is important to note that there is no contention that the Maryland regulation is infected with a racially discriminatory purpose or effect such as to make it inherently suspect. Cf. McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222."

Relying on this footnote, the plaintiffs seek to distinguish *Dandridge* by charg-

---

1. Social Security Act of 1935, §§ 401 et seq. [42 U.S.C. §§ 601 et seq.].

ing that Virginia's imposition of ceilings on AFDC grants discriminates against black recipients in violation of the Equal Protection Clause and the Civil Rights Act of 1964.[2] In support of this claim, they point out that Virginia has had a policy of discriminating against black people in other ways. To show that this policy affected the state's welfare program, they rely on the following undisputed facts: In 1958, the Department of Welfare and Institutions made a study of the race of persons receiving aid under various assistance programs, and the next year it applied a ceiling to AFDC. At no time did it similarly restrict other programs. The majority of persons receiving assistance under AFDC were black, but the majority receiving assistance under other programs were white. Current percentages are: AFDC—66.6% black, 33.2% white, 0.2% other races; Old Age Assistance—38% black, 62% white; Aid to Permanently and Totally Disabled—48% black, 52% white.

█ We agree with the plaintiffs that their allegation of racial discrimination must be examined with special scrutiny. Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); McLaughlin v. Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). But the evidence does not sustain the charge. In the first place, the facts show no discrimination between black and white applicants for AFDC, and neither race has been favored in the administration of the program.

█ It is not enough, however, to show that the law has been applied equally among members of the class defined by the regulation. The classi-

fication must not be the product of arbitrary or invidious discrimination. McLaughlin v. Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). Here the evidence discloses no overt racial purpose in the distinction the state makes between recipients of AFDC and persons who are assisted under other programs. In this respect the case differs from *McLaughlin* and *Loving*, where interracial couples were expressly treated differently from couples of the same race with respect to cohabitation and marriage.

██ But the court must look beyond the terms of the regulation, for that which is fair upon its face may nevertheless discriminate. See, e. g., Griffin v. State Board of Ed., 296 F.Supp. 1178 (E.D.Va.1969). Again, we find no evidence of racial discrimination. Although black persons are in the majority, the AFDC program embraces many white people. Moreover, black people in large numbers are assisted by the other welfare programs on which no maximum is placed. Additionally, AFDC is by far the largest of the welfare programs,[3] and during the past five years, it has shown a much larger percentage of increase than other programs.[4] The magnitude and growth of AFDC, coupled with the lack of overt discrimination, justify the classification as reasonable in light of the necessity of the state to allocate finite resources among the needy. See Dandridge v. Williams, 397 U.S. 471, 479, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Furthermore, it is clear that inherent differences in the several programs justify the imposition of a ceiling on AFDC alone. For example, recipients of Old Age Assistance or Aid to Permanently and Totally Disabled

2. Title 42 U.S.C. § 2000d provides:
"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

3. The number of people receiving aid in March 1970 were: Old Age Assistance, 13,474; Aid to Permanently and Totally Disabled, 7,782; and AFDC, 92,726.

4. From July 1965 to March 1970, the percentages of increase were: Old Age Assistance, 3%; Aid to Permanently and Totally Disabled, 14%; and AFDC, 120%.

are not often part of family units so large that maximum grants based on the size of the family play any significant role in allocating funds.

■ We conclude, therefore, that the imposition of a ceiling on AFDC grants does not violate either the Equal Protection Clause or the Civil Rights Act of 1964.

## II.

Section 402(a) (23) of the Social Security Act of 1935 [42 U.S.C. § 602(a) (23)] provides:

"A State plan for aid and services to needy families with children must * * * provide that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted."

The plaintiffs contend that Virginia's regulations do not conform with this statute because the state failed to raise the AFDC standard utility allowance on July 1, 1969, to reflect the increased cost of utilities. They seek a retroactive increase from that date.

The evidence discloses that pursuant to § 402(a) (23) the state raised, effective July 1, 1969, all components of its AFDC grants to reflect the increase in the cost of living except the utility allowance.[5] The cost of utilities has increased approximately 13% since 1960 when the allowance was last adjusted. The state recognizes this rise in cost, and the legislature has appropriated funds to increase the allowance effective July 1, 1970.

Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) contains a definitive interpretation of § 402 (a) (23). In a prefatory explanation [397 U.S. at 408, 90 S.Ct. at 1216], Mr. Justice Harlan said:

"There are two basic factors that enter into the determination of what AFDC benefits will be paid. First, it is necessary to establish a 'standard of need,' a yardstick for measuring who is eligible for public assistance. Second, it must be decided how much assistance will be given, that is, what 'level of benefits' will be paid. On both scores Congress has always left to the States a great deal of discretion."

The Court then went on to hold that although § 402(a) (23) requires a state to redetermine its standard of need to reflect the rise in the cost of living, this section does not compel the state to raise the level of payments. In the Court's words [397 U.S. at 412, 90 S.Ct. at 1218]:

"[A] State may, after recomputing its standard of need, pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it may not obscure the *actual* standard of need."

■■ We conclude that Virginia has in all practical respects complied with § 402(a) (23). It has increased its standard of need to reflect the rise in utility costs, but it has, in effect, "pared down" its payment of these allowances until July 1, 1970. *Rosado* requires only an increase in the standard of need. It is up to the state to decide the level of payment which it will make toward satisfying that need.

The injunction sought by the plaintiffs is denied, and this case is dismissed. Each party shall bear its own costs.

5. The maximum was also raised to meet the change in living costs.