Eula Mae FISHER, for herself and all others similarly situated, Plaintiff-Appellant,

v.

The SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE et al., Defendants-Appellees.

No. 74–1740.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1975.

Decided Sept. 3, 1975.

Rehearing Denied Sept. 24, 1975.

Rose E. Firestein, John T. Manning, Russell E. Lovell, II, Indianapolis, Ind., for plaintiff-appellant.

John E. Hirschman, U. S. Atty., Indianapolis, Ind., Carla A. Hills, Asst. Atty. Gen., Eloise E. Davies, Atty., Appellate

Section, Civil Div., Dept. of Justice, Washington, D. C., for defendants-appellees.

Before PELL and SPRECHER, Circuit Judges, and PERRY, Senior District Judge.*

PELL, Circuit Judge.

This is an appeal from a judgment of the district court affirming the decision of the Secretary of the United States Department of Health, Education and Welfare denying compensation insofar as plaintiff's complaint sought review of that decision and dismissing the remainder of the complaint. Plaintiff [1] is a black woman who worked for various persons as a domestic servant until July 1966. She worked as a dishwasher at a hotel from July of 1966 until October 1968 at which time she was injured while working. Her complaint alleges that this injury resulted in her becoming disabled within the meaning of various subsections of the Social Security Act. 42 U.S.C. § 423; 20 C.F.R. § 404.1501 ff. She filed a claim under 42 U.S.C. § 401 ff. Her claim was denied by the hearing examiner of the Social Security Administration (now Administrative Law Judge; hereinafter ALJ) on the grounds that she failed to establish eligibility for disability compensation by showing the requisite earnings during the preceding 40 quarters, principally because of a lack of showing of compensation of at least $50.00 per quarter for sufficient quarters from a single employer for the period during which she worked as a domestic employee. 42 U.S.C. §§ 423(c)(1)(B)(i), 409(g)(2). See also 26 U.S.C. § 3121(a)(7)(B). The Appeals Council affirmed this decision, and plaintiff filed this action for review under 42 U.S.C. § 405(g) in addition to seeking other relief.

---

* Senior District Judge Joseph Sam Perry of the United States District Court for the Northern District of Illinois was sitting by designation.

1. Sometime subsequent to the filing of her complaint but prior to the judgment in the district court, Eula Mae Fisher died. This fact came to the attention of the governmental defendants through the filing of a death claim by her husband. Upon motion of the defendants, the husband as administrator of the estate was substituted in this court as party plaintiff. For convenience of reference, however, in this opinion we have treated the matter as though Mrs. Fisher continues as the active claimant.

Count I of plaintiff's complaint alleges that the conclusions of the ALJ were not supported by substantial evidence. On appeal she argues that the ALJ applied too strict a standard in determining that plaintiff had not met her burden. In Count II of the complaint, plaintiff alleges that the Secretary of the Treasury and his delegate (the Commissioner of Internal Revenue) have failed "to compel, to attempt to compel. or to take prudent measures to compel" the collection of the employment tax. Plaintiff seeks mandamus relief to compel the collection of the employment tax on domestic workers' salaries if the $50.00 per employer per quarter limitation is declared unconstitutional or mandamus to compel the Commissioner to require reporting of all domestic workers' wages paid if the limitations are upheld. See 26 U.S.C. § 3121(a)(7)(B). Count III of the complaint seeks a permanent injunction against the Secretary of the Treasury, the Secretary of the Department of Health, Education and Welfare, and the Commissioner of Internal Revenue enjoining them from enforcing the one employer earnings requirement against black citizens. She alleges that these provisions are void because:

"they segregate a certain class of all employees by race and status to be denied disability insurance under the Social Security Act and therefore deny them civil and human rights inhering in the due process clause of U.S.Const. Amends. V, XIII and XIV, and freedom from slavery and servitude guaranteed by U.S.Const. Amend. XIII. These irrational, arbitrary conditions . . . perpetuate bondage and peonage, forbidden by terms of U.S. Const. Amend. XIII and the Anti-Peonage Act, 42 U.S.C.A. 1994 (1969)."

Counts II and III are brought as a class action. The complaint was later amended to ask for a declaration that the minimum earnings requirement during a certain number of quarters as such was unconstitutional and for an injunction against its enforcement. The complaint was also amended to plead that domestic

workers are an identifiable black racial group, an identifiable sexual group of women, and an identifiable economic group of poor wage-earners. On appeal, plaintiff argues that the district court erred in dismissing each count and also erred in not convening a three-judge court. The plaintiff urges us to decide the constitutional questions rather than remanding for a three-judge court to be constituted. According to plaintiff, all the facts needed for us to decide this portion of the case are matters of public record.

### I. Sufficiency of Evidence

We must uphold the decision of the Secretary if it is supported by substantial evidence. 42 U.S.C. § 405(g). In his opinion the ALJ stated:

"following the expiration of the statute of limitations with respect to any year the absence of any entry of the Secretary's records as to the wages alleged to have been paid by an employer to an individual during any period in such year shall be presumptive evidence that no such alleged wages were paid to such individual in such period."

This quotation is an accurate paraphrase (almost a quotation) of 42 U.S.C. § 405(c)(4)(B) and 20 C.F.R. § 404.804, under which the ALJ was required to evaluate the evidence.

As a part of his evaluation of the evidence, the ALJ stated:

"Since in the instant case there is no showing of wages on the individual's earnings record for the periods in question, the evidence required to prove the alleged wages must be *substantial* and *of probative value* and must clearly establish both the amount of wages paid and the time of payment. Moreover, the evidence necessary to establish these wages for a period in a year or years when the statutory limitation has expired must also be sufficient *to overcome the statutory presumption that no such wages were paid.*

"The record before the hearing examiner is *void of factual or conclusive*

*evidence to substantiate the claimant's allegations of wages paid during the period involved.* Since the claimant has been unable to meet the burden of proof and has failed to furnish adequate evidence of alleged wages paid to establish additional quarters of coverage, the hearing examiner is constrained to conclude that the claimant lacks the necessary quarters of coverage to be fully insured and that she is not entitled to disability insurance benefits." (Italics added.)

Plaintiff argues that the italicized phrases show that the ALJ required her to meet too heavy a burden of proof and that he ignored her testimony. She principally relies on *Breeden v. Weinberger,* 493 F.2d 1002 (4th Cir. 1974), and *Kephart v. Richardson,* 505 F.2d 1085 (3d Cir. 1974).

The consideration of these cases takes us on the customarily difficult journey on the shimmering semantical sands involved when an effort is made to put into words the concept of the dispositive effect of a presumption when the determiner of ultimate fact also has before him other evidence.

In *Breeden* the court reversed a decision in which the ALJ and the district court had required the claimant to prove her case by "clear and convincing evidence." The Fourth Circuit held that the presumption did not alter the burden of proof requirement that a claimant need only prove his administrative claim by a preponderance of the evidence. The court further held, however, that the statutory presumption here involved did not vanish when contradictory evidence was introduced under the Thayer "bursting bubble" theory of presumptions, but rather that the presumption would survive the offering of contradictory evidence and could thereafter constitute substantial evidence that no wages were paid. 493 F.2d at 1007.

Upon the basis of the evidence in the case before it, which evidence need not be repeated here, the Fourth Circuit concluded that the administrative decision was not supported by substantial evidence. A reading of the opinion makes it obvious that a substantial motivating factor in the court's decision was the arbitrary rejection of evidence by both the ALJ and the Appeals Council. It, of course, can scarcely be contended that the statutory presumption should be the basis for rejecting consideration of evidence simply because it is contrary to that created by the presumption.

In *Kephart* the Third Circuit reversed and remanded for further proceedings the denial of a claim on the grounds that the ALJ had applied too strict a standard in requiring "substantial evidence . . . sufficient to rebut the presumption of validity accorded by law to the Secretary's wage records." 505 F.2d at 1088. The court recognized that the Wigmore (Thayer) theory of presumptions did not apply to this statutory presumption but held that it is merely one evidentiary factor to be weighed along with other evidence. The court also stated, 505 F.2d at 1089, that it saw nothing in the statute which required the claimant to rebut the negative condition of the records by "substantial evidence," citing on a "*cf.*" basis *Thacker v. Gardner,* 268 F.Supp. 663 (W.D.Va.), aff'd, 387 F.2d 387 (4th Cir. 1967), *cert. denied,* 390 U.S. 1017, 88 S.Ct. 1272, 20 L.Ed.2d 168. We note that although the court denied the need for corroboration of the claimant's testimony if the ALJ found his testimony credible, in *Kephart* the claimant's testimony was in fact corroborated by his wife and three other persons. Corroboration of testimony can, of course, be a strong factor in minimizing doubts an ALJ might have regarding a claimant's testimony.

The defendants in the present case in support of the determination below rely in part upon *Thacker, supra.* However, in *Breeden* the court stated that it "did not necessarily approve the district court's apparent insistence on 'positive evidence.'" The court went on to state that its per curiam opinion affirming in *Thacker* merely noted that there was substantial evidence supporting the administrative decision and that the evi-

dence in that case was far weaker than in the present case. 493 F.2d at 1005 n. 3.

In final analysis it appears to us that we have to determine whether the italicized words in the ALJ's evaluation of the evidence so clearly indicate that an incorrect standard was in fact applied as to cause us to determine ultimately that his decision was not supported by substantial evidence.

 Having carefully studied the ALJ's opinion, we cannot conclude that he applied an improper standard in evaluating plaintiff's claim. While it may not be necessary for there to be substantial or positive evidence specifically rebutting the statutory presumption before the ALJ can find for a claimant, there must be substantial evidence in the record as a whole supporting his decision or it is subject to attack on appeal. 42 U.S.C. § 405(g). As we read his entire opinion, the ALJ was doing no more than stating this proposition when he referred to evidence that is "substantial and of probative value." Evidence, of course, cannot be substantial if it is not of probative value. Both *Breeden* and *Kephart* were factually much stronger cases for the claimants than this case.

Similarly we cannot find that the ALJ ignored plaintiff's testimony. His discussion of the evidence shows that he was aware of her contentions even though he found neither "factual" nor "conclusive" evidence supporting her claim. In context it appears he was doing no more than stating that he did not credit her testimony. Some of the ALJ's characterization language is perhaps unfortunate. Ordinarily one would not say that the record was "void of factual or conclusive evidence" as meaning that there was evidence (here by the claimant) which was found not to be credible. While this would not seem to be an accurate equation, nevertheless, we can reach no conclusion other than the ALJ considering all of the evidence before him, including that of the claimant, found her testimony sufficiently lacking in credibil-

ity to overcome the affirmative evidence of lack of requisite payment when considered in the context of the statutory presumption. We agree with *Breeden* that the presumption did not evaporate. 493 F.2d at 1007.

We have no basis for doubting the verity of the ALJ's statement that he had carefully considered the very excellent brief submitted by Mrs. Fisher's counsel, "the depositions he furnished from former employers of the claimant *and from Mrs. Fisher,* as well as numerous statements from former employers." On these bases, he found that Mrs. Fisher had failed *"to furnish adequate evidence"* and he was therefore constrained to conclude that she lacked the necessary quarters of coverage. (Emphasis added.)

Plaintiff, however, argues that the opposing evidence of the employers was conclusory and contradictory principally in that the witnesses stated little more than that they did not pay Mrs. Fisher more than $50.00 per quarter. This, however, is a factual matter in which lay witnesses are dealing only with amounts susceptible of precise mathematical determination. Also some of the evidence was more specific than the general denial of the requisite amount. We cannot assume that the ALJ in evaluating the employers' testimony would not have been aware of an underlying motivation to be forgetful if an employer had in fact not filed returns and paid taxes which he legally was required to do.

The question is not whether we would have reached the same conclusion as did the ALJ if we had been the trier of fact. Our sole inquiry is whether his decision is supported by substantial evidence. We cannot say that it is not.

## II. Constitutionality

### A. *Jurisdiction*

While this case was under advisement, the Supreme Court decided *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), which calls to our attention a serious question regarding our jurisdiction to consider the constitu-

tional claims, an issue which was not raised, briefed or argued. The complaint alleges jurisdiction for the class action claims "through U.S.Const. Amends. V, XIII, and XIV and 28 U.S.C.A. Sec. 1331(a), 1343(4), 1346(a), (2), 1361, 2201, 2202 and 2282."

██ The third sentence of 42 U.S.C. § 405(h) provides: "No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter." Prior to the 1948 recodification of Title 28, § 41 included the jurisdictional provisions which are now contained, *inter alia*, in §§ 1331(a), 1343(4), and 1346(a)(2). Therefore these sections cannot provide jurisdiction against the enumerated officers. Section 1361 provides jurisdiction in the nature of mandamus to compel officers and employees of the United States to perform their duty. The only mandamus relief sought is against the Secretary of the Treasury and the Commissioner of Internal Revenue. This section does not provide jurisdiction to hear the constitutional challenges. The mandamus issue is treated in part III, *infra*. Sections 2201 and 2202 provide authorization for the federal courts to grant declaratory relief. They do not provide an independent basis for jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). Section 2282 only provides that a constitutional challenge to a federal statute seeking injunctive relief must be heard by a three-judge court. Thus, under *Salfi*, we hold that there was no jurisdiction as to the class action claims against the Secretary of Health, Education and Welfare. *Salfi* makes it clear that this court has jurisdiction to consider Mrs. Fisher's constitutional claim. Whether an injunction would be proper relief under § 408(g) was not decided by the Supreme Court in *Salfi*. 422 U.S. at 763, n. 8, 95 S.Ct. 2466, n. 8. Because of our decision regarding the insubstantiality of Mrs. Fisher's constitutional claim, we need not reach the question of the propriety of injunctive relief. The claims which were sought to be asserted as class actions against the Secretary of the Treasury and the Commissioner of Internal Revenue are in no better position than those of Mrs. Fisher against the Secretary of Health, Education and Welfare, which individual claims we must decide. See 26 U.S.C. § 7421.

B. *Equal Protection and Due Process*

██ In determining whether plaintiff's constitutional claims were properly dismissed, we must accept the allegations of the complaint as true. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In *Sheehan v. Scott*, 520 F.2d 825 (7th Cir. 1975), we recently restated the standard for determining whether a single judge can dismiss a claim which would be required to be heard by a three-judge court, quoting from *Idlewild Bon Voyage Liquor Corp. v. Epstein*, 370 U.S. 713, 715, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962):

"When an application for a statutory three-judge court is addressed to a district court, the court's inquiry is appropriately limited to determining whether the constitutional question raised is substantial, whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three-judge statute." 520 F.2d at 827. *Cf. Wojcik v. Levitt*, 513 F.2d 725 (7th Cir. 1975).

The Social Security Act originally excluded domestic workers from coverage entirely. Act of August 14, 1935, ch. 531, § 210(b)(2), 49 Stat. 625. In 1950 the Act was amended to cover domestic employees if they earned $50.00 per quarter from a particular employer and worked at least 24 days for that employer. Act of August 28, 1950, ch. 809, § 104(a), 64 Stat. 493. The present section was enacted in 1954. Act of September 1, 1954, ch. 1206 § 101(a)(1), 68 Stat. 1052.

In the early cases of *Carmichael v. Southern Coal Co.*, 301 U.S. 495, 57 S.Ct.

868, 81 L.Ed. 1245 (1937), and *Steward Machine Co. v. Davis,* 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937), a Social Security Act sponsored state unemployment compensation act and the Social Security Act itself were held constitutional against attacks which raised Fourteenth Amendment and Fifth Amendment issues of equal protection and due process arising, *inter alia,* from the exemption for domestic workers. The Social Security Act was similarly challenged and upheld after the 1950 domestic servant provisions became effective. *Abney v. Campbell,* 206 F.2d 836 (5th Cir. 1953), *cert. denied,* 346 U.S. 924, 74 S.Ct. 311, 98 L.Ed. 417 (1954). None of these cases, however, involved claims of racial, economic, or sexual discrimination.

Recently the agricultural workers exclusion from coverage was challenged on the grounds that any justifiable basis it might originally have had was no longer valid. *Romero v. Hodgson,* 319 F.Supp. 1201 (N.D.Cal.1970), *aff'd,* 403 U.S. 901, 91 S.Ct. 2215, 29 L.Ed.2d 678 (1971). The court upheld the validity of the exclusion, applying the "any conceivable set of facts" test stating that under-inclusive classifications are particularly resistant to judicial challenge. Courts do not require the state to remedy all aspects of a problem or none at all. No allegation of racial, sexual, or economic discrimination was made in the lower court. The agricultural exclusion was also challenged in *Doe v. Hodgson,* 344 F.Supp. 964 (S.D.N.Y.1972), *aff'd* (with opinion), 478 F.2d 537 (2d Cir. 1973), *cert. denied,* 414 U.S. 1096, 94 S.Ct. 732, 38 L.Ed.2d 555. In *Doe* the argument was made that the exclusion was racially discriminatory because agricultural workers were "overwhelmingly black and chicano." 344 F.Supp. at 966. The lower court denied the petition to convene a three-judge court noting that the same racial argument had been made in the Jurisdictional Statement to the Supreme Court in *Romero.* The Second Circuit affirmed without placing emphasis on the Jurisdictional Statement.

While there has been some lack of clarity as to the exact effect of a summary affirmance or a dismissal for want of a substantial federal question by the Supreme Court, we are constrained by the recent decision in *Hicks v. Miranda,* 422 U.S. 332, 343–345, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), to deem this court bound by summary decisions of the Supreme Court until informed that we are not. However, the plaintiff argues that the present case nevertheless is not controlled by *Romero-Doe* because of several distinguishing features: the domestic worker classification is claimed to be particularly suspect because as a class this type of worker reflects all three suspect classifications of race, sex, and economics; and the agricultural workers were totally excluded from coverage while domestic workers purport to be covered but are subject to much more stringent standards for qualifying than are other covered employees. We therefore deem it advisable to review the applicable law.

■ Much of our analysis is in the terms argued by plaintiff of the equal protection clause of the Fourteenth Amendment. Since this case involves a challenge to a federal statute, the Fourteenth Amendment is not directly implicated. Nevertheless, where a federal statute meets the equal protection tests under the Fourteenth Amendment, it is perforce consistent with the due process clause of the Fifth Amendment. *Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); *cf. Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

■ Racial classifications are, of course, inherently suspect. *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). Plaintiff argues that sexual and economic classifications are subject to similar scrutiny. If we found discrimination and the government attempted to justify the classifications, then we would have to face this issue. First, however, plaintiff must show an intent to discriminate.

Plaintiff places heavy reliance on statistics which she alleges show that domestic workers are a class of poor, black women. Nevertheless, she correctly admits that statistical disproportion in a class drawn in social welfare legislation is not a sufficient basis to declare the statute void. Some showing of intent is required, but it is unclear from prior cases exactly what that showing must be.

In *Jefferson v. Hackney*, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), plaintiffs challenged a percentage reduction system which lowered Aid to Families with Dependent Children (AFDC) benefits to a larger extent than other aid programs. Statistics showed that a much larger percentage of AFDC recipients were black or chicano than the recipients of the other programs. The district court found that welfare officials did not know the racial make up of the categories of recipients and that the reduction was not the result of racial or ethnic prejudice. Citing *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the Court reaffirmed that a state does not violate the equal protection clause merely because the classifications made by its laws are imperfect. It held:

> "So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straitjacket." 406 U.S. at 546, 92 S.Ct. at 1731.

A similar challenge was made to a three-judge court in *Stanley v. Brown,* 313 F.Supp. 749 (W.D.Va.1970). The plaintiffs argued that a ceiling on AFDC benefits was invalid. The ceiling had been placed on the program only a year after a study showed that the majority of AFDC recipients were black. It was also claimed that Virginia had a history of discrimination against black people in other ways. The court noted that there was no overt discrimination and refused to infer discrimination. The court found the reasons for the ceiling were sufficient to uphold it. A similar result on similar facts was reached in *Ward v. Winstead,* 314 F.Supp. 1225 (N.D.Miss. 1970), *appeal dismissed,* 400 U.S. 1019, 91 S.Ct. 587, 27 L.Ed.2d 630 (1971) (three-judge court).

Plaintiff argues that intent should be found where it can be shown that Congress knew or should have known that a class was composed principally of minority members. In so arguing plaintiff suggests the analogies of school desegregation cases and juror selection cases. *E. g. United States v. Board of School Commissioners,* 474 F.2d 81 (7th Cir. 1973), *cert. denied,* 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041; *Avery v. Georgia,* 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953). As we read the school desegregation cases, more than mere knowledge is required. In *Board of School Commissioners,* for example, it was the consistent pattern of actions which resulted in this court finding intentional discrimination. In the jury cases the opportunity to discriminate combined with knowledge of potential jurors' race has been held sufficient to show discrimination at least where statistically improbable panels result.

In her reply brief, plaintiff cites *Clark v. Universal Builders, Inc.,* 501 F.2d 324 (7th Cir. 1974), *cert, denied,* 419 U.S. 1070, 95 S.Ct. 657, 42 L.Ed.2d 666, and *Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920 (2d Cir. 1968). Both are housing cases, and as plaintiff states in her original brief, they are inappropriate models for that reason. In areas such as housing rights, where Congress has acted, courts may find intent to be inferred from a showing of discriminatory effects alone.

No case has been cited to us which adopts plaintiff's far-reaching theory as applied to a legislature or Congress. Under her theory any classification could be challenged if any data was available, whether Congress was aware of it or not, which showed that a class contained a high percentage of minorities. That this is not the law follows from *Jefferson v. Hackney, supra.* Even though the

district court found that welfare officials did not know the racial makeup of the AFDC recipients, they should have known it because they could have taken a survey or perhaps someone had collected the data. As the Supreme Court said in *Jefferson:*

"The acceptance of appellant's constitutional theory would render suspect each difference in treatment among the grant classes, however lacking in racial motivation and however otherwise rational the treatment might be." 406 U.S. at 548, 92 S.Ct. at 1732.

We now must consider whether the statute has a sufficient rational basis under the test of *Dandridge v. Williams, supra:* "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." 397 U.S. at 485, 90 S.Ct. at 1161. A statute is not unconstitutional because the legislature determined to make reforms one step at a time. *Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Romero, supra.* The legislative history of the domestic worker provisions of the Social Security Act shows such a pattern.

The Senate Report on the 1950 amendments to the Social Security Act shows that Congress was concerned about domestic employees but was also concerned with the difficulties associated with their coverage. The committee report stated:

"4. Employees in domestic service.— This group, whose need for the protection of social insurance is very great, is not covered under present law. They have been excluded mainly because of the administrative difficulties which were believed to be involved in their coverage. Your committee is convinced that regularly employed domestic workers can now be covered without undue administrative difficulties. Domestic servants in private homes, other than those on farms operated for profit, would be covered with respect to their services in a calendar quarter for a particular employ-

er if they earned at least $50 in cash wages and either (a) worked at least 24 days for that employer in the current quarter or (b) had worked for the employer on 24 days or more and had earned cash wages of $50 or more in the preceding quarter. Under this definition of a 'regular' worker, most non-farm domestic employees who are hired on a weekly or monthly basis will be covered, while most part-time workers, and all casual or intermittent workers, will be excluded from coverage. . . .

\* \* \* \* \* \*

". . . On the other hand, the 26-day requirement was reduced to 24 days to permit coverage of the domestic worker who has 'a twice-a-week job,' but who misses 1 or 2 days in a 3-month period." Sen.Rep.No.1669, 81st Cong., 2d Sess., 2 U.S.Code Cong. Serv., pp. 3287, 3302 (1950).

We note that the administrative difficulties would be much greater in collecting tax from employers of domestic workers, who probably are more numerous than their employees, than collecting tax from industrial employers, who typically employ a substantial number of employees. The expenses of collection could conceivably equal or exceed the tax collected. In addition it would be unfair to persons who only worked occasionally to collect tax from them when there was little hope that they would ever be eligible for coverage. The report also shows that Congress was not being arbitrary in choosing a 24-day requirement.

In 1954 Congress further expanded coverage. It had experimented with coverage of domestic workers and presumably determined that less rigid restrictions would sufficiently serve its purposes. It stated:

"[The amendment] would delete the unnecessary and complicated requirement of present law limiting the coverage of domestic workers to those who work for a single employer on 24 days during a calendar quarter. The

simplified test of coverage for domestic services in private homes provided by the bill would cover, during the course of a year, about 250,000 more household workers than does the present law. It would also afford additional coverage for from 50,000 to 100,000 workers who under present law are covered on some but not all of their domestic jobs.

"More of the domestic workers who would continue to be excluded from coverage would be students, housewives, and others who spend comparatively little time working for pay. Under the bill almost 90 percent of the persons whose major activity is domestic employment would be covered." Sen.Rep.No.1987, 83d Cong., 2d Sess., 3 U.S.Code Cong. and Admin.News, pp. 3710, 3717 (1954).

Thus, Congress realized that not all regularly employed domestic workers were covered, such as those who are employed by several employers for a few days a quarter, but nevertheless determined the class it wished to cover. A law is not invalid because a classification made by the legislature is imperfect. *Jefferson, supra.*

■ Finally, it appears that the statistics which the plaintiff stresses at great length stop short of refuting the legislative expression that those who would no longer have coverage would be a minimal group not primarily concerned with the matter of making a living from the performance of domestic work. The thrust of the plaintiff's statistics is that the chief component human group in the domestic worker segment of the labor market are poor black women. We have no reason to believe this may not be so but the statistics tendered to us did not go forward to show that any significant number of those who engaged in this manner of earning a livelihood were deprived of coverage by virtue of quarterly coverage requirement. Lack of coverage resulting from the failure to report whether because of the employer not

wanting to do so or the reluctance of the employee to become involved in reporting her wages to the government is no basis for holding the classification as established to be in violation of the constitution.

## C. *Irrebuttable Presumption*

■ Plaintiff argues that the legislative history shows that Congress' purpose in enacting the limitations on coverage was to cover regularly employed domestic servants and that it was improper for Congress to presume irrebuttably that anyone who did not meet the statutory standards was not regularly employed.

The Supreme Court rejected a very similar argument regarding a minimum period of marriage requirement of a different section of the Social Security Act in *Weinberger v. Salfi, supra,* distinguishing such cases as *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), and *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), upon which plaintiff relies. The majority, in an opinion written by Mr. Justice Rehnquist, set forth the proper principles to apply in considering constitutional challenges to this type of social welfare legislation. 422 U.S. at 768–770, 95 S.Ct. 2457. We have endeavored to apply those principles in part II. B of this opinion. The Court further stated:

"The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule. . . .

\* \* \* \* \* \*

" . . . [The] duration-of-relationship requirement represents not mere-

ly a substantive policy determination that benefits should be awarded only on the basis of genuine marital relationships, but also a substantive policy determination that limited resources would not be well spent in making individual determinations." At 777, 95 S.Ct. at 2472.

As noted by Mr. Justice Rehnquist in his dissent in *LaFleur,* almost any law could be in some sense characterized as an irrebuttable presumption. In the normal case, well established standards of equal protection and due process should be applied to determine the validity of a Congressional enactment. It is only an unusual case where a statute will be declared invalid because of an improper irrebuttable presumption, and the same result would not be reached applying normal equal protection and due process standards.

D. *Minimum Earnings Requirement*

■ As was discussed earlier, the amended complaint asked for a declaration that the minimum earnings requirement for a certain number of quarters as such was unconstitutional. By applying the well established standards discussed above, the argument lacks substantiality.

III. Mandamus

■ Plaintiff's complaint seeks a writ mandating the Secretary of the Treasury and the Commissioner of Internal Revenue to require the reporting of all wages paid domestic servants regardless of whether they exceed the statutory minimums. According to plaintiff this would ensure greater compliance with the law and largely eliminate the problems of incomplete records such as she had. Plaintiff may or may not be correct in her analysis regarding the efficacy of these measures, but the Secretary has a large degree of discretion in determining the proper measures to take to enforce the tax laws. In addition, enforcing these reporting requirements would present many of the administrative difficulties which caused Congress

to exclude employees of certain employers from coverage.

For the reasons hereinbefore set forth, the judgment of the district court is

Affirmed.