**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**The BOARD OF SCHOOL COMMISSION-**
**ERS OF the CITY OF INDIANAPOLIS,**
**INDIANA et al., Defendants-Appellants.**

**No. 72–1031.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1972.

Decided Feb. 1, 1973.

Certiorari Denied June 25, 1973.

See 93 S.Ct. 3066.

C. Wendell Martin, John O. Moss, Indianapolis, Ind., for defendants-appellants.

David L. Norman, Asst. Atty. Gen., Brian K. Landsberg, Atty., Dept. of Justice, Washington, D. C., Stanley B. Miller, U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before KNOCH, Senior Circuit Judge, and FAIRCHILD and PELL, Circuit Judges.

PELL, Circuit Judge.

This is an appeal from an order [1] by the district court finding that the Board of School Commissioners for the School City of Indianapolis, Indiana ("School City") [2] had been following a course of *de jure* segregation in violation of the holding of the Supreme Court in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*). On the basis of this finding, the district court determined as a conclusion of law that it had authority to order the School City to take "affirmative action" to convert to a unitary system.[3] The district court, as trier of fact, made detailed findings of fact to support the ultimate finding of *de jure* segregation and we shall not attempt to recapitulate those findings, except where specifically required. We do note, however, that the court specifically found that (1) on May 17, 1954 (the date of the decision in *Brown I*), the School Board was operating a dual school system, that is, it was found to have had a "deliberate policy of segregating minority (Negro) students from majority (white) students," and (2) that the Board had not changed its policies so as to eliminate such *de jure* segregation on

---

1. The district court's Memorandum of Decision is set out in full as United States v. Board of School Commissioners of City of Indianapolis, Indiana, 332 F.Supp. 655 (S.D.Ind.1971).

2. The district court noted at 332 F.Supp. at 675–676 that by special act of the Indiana legislature the School City of Indianapolis is no longer coterminous with the civil or corporate city of Indianapolis. We draw no inferences from this fact.

3. The district court ordered interim relief and, pursuant to Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (*Brown II*), retained jurisdiction to order further relief. In its brief, the School City questioned the specific interim relief regarding the Forest Manor Middle School, but that controversy was settled prior to oral argument.

or before May 31, 1968 (the date on which the Government filed its complaint), 332 F.Supp. at 658.

■ Before turning to appellants' contentions, we first enunciate a few general principles on which the opinion of this court is based. In order to support a finding of *de jure* segregation, it is not necessary that there be a complete separation of the races. Certainly school systems totally segregated by force of a state law have been found to violate *Brown I,* but other districts in which segregation has been only partially effective (that is, in which there are some integrated schools) have been held to be equally in violation. *See* Davis v. School District of City of Pontiac, Inc., 309 F.Supp. 734, 740 (E.D.Mich.1970), aff'd, 443 F.2d 573 (6th Cir. 1971); United States v. Board of Education, Independent School District No. 1, Tulsa County, Oklahoma, 429 F.2d 1253 (10th Cir. 1970). Further, the actions of the Board of School Commissioners and its duly-appointed representatives and agents may be sufficient to constitute *de jure* segregation without being based on a state law, or even if they are in derogation of state law forbidding segregation.[4] *See* Keyes v. School District No. 1, Denver, Colorado, 445 F.2d 990 (10th Cir. 1971), cert. granted, 404 U.S. 1036, 92 S.Ct. 707, 30 L.Ed.2d 728 (1972); Bradley v. Milliken, (6th Cir., filed Dec. 8, 1972) (slip op. at pp. 49–50).

■ Another principle which comes into play in examining the district court's opinion relates to the affirmative duty placed on a school board "to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board of New Kent County, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). This affirmative duty attaches to any school system guilty of *de jure* segregation at the date it became illegal under *Brown I,* May 17, 1954. Thus, we reject the distinction, proposed in the district court by the *amicus curiae,* between violation (initial, *e. g., Brown I*) cases and remedial (enforcement, *e. g., Brown II*) cases, for a court in a remedial case when it is considering what remedy to order looks to the same factors as it did when it determined that there was a violation of the mandate of *Brown I.* A school board, after years of *de jure* segregation, cannot blithely say that it has become "color blind" the day before a suit is filed and thereby avoid liability. As the Supreme Court recognized in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), not all "invidious racial distinctions" are readily eliminated. It is in this sense clear that factors viewed as being reflective of *de jure* segregation in remedial cases would be similarly significant in the initial determination of whether or not there has been a violation of constitutional rights. It is in this way that the remedial cases are relevant to the present case.

On this appeal, defendants basically present two arguments: first, that the district court erred as a matter of law in basing its finding of *de jure* segregation on the evidence of mere racial imbalance in the schools, and second, that the district court's finding that segregation resulted from the School Board's actions, and therefore was *de jure,* was clearly erroneous. Although the first point might appear to be subsumed in the second, there is a distinction between the two as the second assumes, *arguendo,* that the district court did not make the mistake claimed in the first point.

■ Appellants first assert that there is no constitutional duty to remedy the effects of racial imbalance or to

---

4. In 1949, the Indiana General Assembly passed an Act requiring desegregation on a phased basis, ending the official State policy of segregation, Acts 1949, ch. 186, p. 603.; Burns Ind.Stat.Ann. §§ 28–6106 to 28–6112 (1970), IC 1971, 20–8–6–1 to 20–8–6–7.

maintain any particular racial balance in the public schools. The Government does not quarrel with this assertion, and, indeed, insofar as it relates to purely *de facto* segregation, *unaided by any state action*, it is the law of this circuit, Bell v. School City of Gary, Indiana, 324 F. 2d 209 (7th Cir. 1963), aff'g 213 F. Supp. 819 (N.D.Ind.1963). The Board contends that since no student since *Brown I* has ever been compelled to go to a school because of his race nor denied admission to a school because of race, the racial imbalance presented in the record cannot support a finding of *de jure* segregation. In sum, appellants seek to portray this case as one of *de facto* segregation only, and argue that there is no duty to alleviate such racial imbalance which the Board did not cause. Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966); Bell v. School City of Gary, *supra*.

The difficulty with this line of reasoning is that it does not comport with the findings of fact of the district court. As Judge Kiley has said for this court,

"The weakness in this argument is that the district court did not find that defendants inherited an innocent de facto segregation situation, but found that they inherited from their predecessors a discriminatorily segregated school system which defendants subsequently fortified by affirmative and purposeful policies and practices which effectually rendered de jure the formerly extant de facto segregation. . . . This is not a case of mere 'inaction' under the court's finding of the unlawful actions of the Board." United States v. School District 151 of Cook County, Illinois, 404 F.2d 1125, 1131 (7th Cir. 1968).

The present case—in which, as will be discussed below, the district court found gerrymandering of districts, segregation of faculty, and other indicia of a dual system—stands in marked contrast to the *Deal* and *Bell* cases, above, where the district courts made specific findings of no such discriminatory practices by the boards.[5] Similarly, the present case is unlike Banks v. Muncie Community Schools, 433 F.2d 292 (7th Cir. 1970), where the court remarked that the record failed to disclose evidence of either racial motivation in board policies or a history of racial segregation from which such motivation might be inferred. Here, the district court commented extensively on both aspects in its opinion.

But appellants point to the language in the Supreme Court's opinion in *Swann, supra*, 402 U.S. at 24–25, 91 S. Ct. 1267, which states that a particular racial balance is not necessary in each school and that one-race schools may be acceptable. They extrapolate from this that, since the only evidence before the trial judge was that of racial imbalance, the holding must be clearly erroneous, Rule 52(a), Fed.R.Civ.P. Our review of the record and the district court's opinion convinces us that this contention cannot be sustained. What the district court's opinion relates is a pattern of decision-making which it determined reflected a successful plan for *de jure* segregation. Although it might not be possible to infer the requisite discriminatory intent from any one instance or example in the record, it is clear that the district court found a purposeful pattern of racial discrimination based on the aggregate of many decisions of the Board and its agents. See Davis v. School District of the City of Pontiac, Inc., 443 F. 2d 573, 576 (6th Cir. 1971).

The appellants deny any conscious motivation on the part of their predecessors or themselves to foster, or even continue, segregation policies in the school system; however, in examining that which was in existence at the time of *Brown I* and that which transpired

---

5. In *Bell*, there was a specific finding that there was no change in the school district boundary lines, and thus no gerrymandering. Also in *Bell* there were examples of black students being transferred from predominantly black schools to predominantly white schools to relieve overcrowding.

thereafter, the courts are not precluded from drawing the normal inference of intent from consciously consummated acts. Intent, in this sense, may or may not be consistent with expressed motivation.

■ There is no doubt that the statistics as to the extreme racial imbalance in various schools, especially those schools previously segregated by state law until 1949, was one of the factors which the district judge considered. But even though no particular racial balance is *per se* necessary, *Swann* does not say that such imbalance may not be considered as one factor from which the district court may infer a segregatory intent.

■ Inasmuch as our review of the district court's order, as discussed hereinafter, reflects that the racial imbalance was only one factor considered by the district court, we reject appellants' first contention that the finding of *de jure* segregation was based merely on evidence of racial imbalance.

■ The Board also rests its case on the alleged mistake of the district court in inferring *de jure* segregation from various acts which encouraged racial imbalance in the schools. It argues that these underlying findings of fact are clearly erroneous insofar as they place the blame for the present system's racial imbalance on actions taken by the Board and its agents. To show *de jure* segregation, rather than *de facto* segregation, the Government must show improper intent and causation. Throughout the trial and in its brief in this court, the Board emphasized not only its lack of intent, but also that the schools which are predominantly or completely black would have become so no matter what the Board did as long as it maintained some policy approximating that of a neighborhood school system. It is to these contentions that we now turn.

■ Initially, we must consider appellants' contention that they have adhered nondiscriminatorily to a policy of neighborhood schools. We are, of course, limited by the fact that we can only set aside the district court's findings if they are clearly erroneous, Rule 52(a), Fed.R.Civ.P., and cannot substitute our "findings" for those of the district court, Northcross v. Board of Education of Memphis, Tennessee, City Schools, 397 U.S. 232, 235, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970), as requested by appellants in oral argument, even though much of the record is documentary.[6] We also note that appellants are most strenuous in their denial of any present discriminatory activity, leaving the actions of the 1950's as little more than ancient history with minimal or no probative value for this case. At this point, we need only note that most of the practices and policies discussed below were present in May of 1954 and that the evidence of both segregatory intent and causation is substantial enough to support the district court's findings. Further, as noted above, the fact that the Board's predecessors were guilty of unlawful segregation after *Brown I* does have an impact on the Board's case today. It placed the Board thereafter under an affirmative duty to eliminate all vestiges of the dual system.

■ The district court made detailed findings regarding a number of practices which it considered supported the ultimate finding of *de jure* segregation. Perhaps the most extensive finding related to gerrymandering of school attendance zones within the allegedly neutral framework of the neighborhood school system. In the Board's initial set of neighborhood boundary lines, the district court found,

---

6. There were over 190 exhibits introduced into evidence by the parties, many with multiple sub-parts. Yet, it would be inaccurate to say that the documentary evidence was all that was involved since the trial lasted several days, with the transcript covering over 2000 pages if three depositions admitted into evidence are included.

"[they] were drawn with knowledge of racial residential patterns and the housing discrimination underlying it. Not only did the Board not attempt to promote desegregation, but the boundary lines tended to cement in the segregated character of the elementary schools." 332 F.Supp. at 666.

Our examination of the record shows this finding to be supported by substantial evidence. Most characteristic is the district carved out for School 64 which exactly covers a small enclave of blacks on the southeast side of Indianapolis. That it was easy for the Board to superimpose these geographical limitations on the patterns of residential discrimination discussed by the district court does not make the congruency of housing and school boundaries inevitable. It was just such a use of boundary lines to lock in previous segregation which was condemned in United States v. School District 151, *supra*, 404 F.2d at 1132, and United States v. Board of Education, Tulsa County, Okla., *supra*, 429 F.2d at 1255 and 1259.

This questionably fortuitous superimposing of boundary lines was highlighted by the district court when it alluded to the inconsistent application of the generally accepted principles for drawing zones for neighborhood schools, thereby increasing racial imbalance, 332 F.Supp. at 666, n. 54. Such evidence was considered probative of the existence of a dual school system in United States v. Board of Education, Tulsa County, Okla., *supra*, 429 F.2d at 1256. On the whole, we think that the record is clearly sufficient to support a finding of gerrymandering of school boundary lines. Certainly, we are unable to say that the finding is clearly erroneous. Once again, it is not any one specific change which would allow a court to find such a fact, but the pattern and practice from which the court could infer the impermissible occurrence.[7] *Cf.*

Downs v. Board of Education of Kansas City, 336 F.2d 988 (10th Cir. 1964). The district court in the present case rejected similar explanations raised by appellants, at least as to some of the changes, and we cannot say that this finding is clearly erroneous on the record before us. We agree with the court in Keyes v. School District No. 1, Denver, Colorado, *supra*, 445 F.2d at 999, that "we can perceive no rational explanation why state imposed segregation of the sort condemned in Brown should be distinguished from racial segregation intentionally created and maintained through gerrymandering, building selection and student transfers." See also United States v. Jefferson County Board of Education, 372 F.2d 836, 876 (5th Cir. 1966), aff'd en banc, 380 F.2d 385 (5th Cir. 1967).

In support of the finding of a policy of gerrymandering school boundaries was the use of optional attendance zones discussed by the district court at 332 F. Supp. at 668. Although the Board asserted a variety of explanations for these optional zones, there is no doubt that its effect was to allow whites in racially mixed neighborhoods to choose to attend a "white" school and blacks to attend a "black" school. There was testimony in the record as to informal practices of encouraging low achievers and problem students who were black to go to all-black Crispus Attucks High School. This practice was identical to one condemned in Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175, 183 (1969), aff'g Hobson v. Hansen, 269 F. Supp. 401 (D.D.C.1967). Moreover, since the optional attendance zones in the present case were superimposed upon a system with a substantial history of state-enforced segregation, we find particularly applicable those cases which have questioned freedom-of-choice plans as a means for eliminating *de jure* segregation.

7. The most graphic example of such gerrymandering is found in the feeder schools chosen to send students to all-black

Crispus Attucks High School in 1954, the year *Brown I* was decided, and continued for years thereafter.

In Green v. County Board of New Kent County, *supra,* and Raney v. Board of Education of the Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), the Supreme Court, although not holding freedom-of-choice plans to be unconstitutional *per se,* stressed that they were not always an effective way of desegregating a dual system, and, in fact, might serve only to perpetuate separation of the races by placing the burden for desegregation on the children and their parents rather than on the school board where it belonged. If we follow the Supreme Court's mandate in Monroe v. Board of Commissioners of the City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968), and look at the effect of the free transfer plan on the school system, then it becomes quite clear that the district court's disapproval of these optional attendance zones was not clearly erroneous.

Further reinforcing the district court's opinion was the stipulated fact that "it had been the general policy and practice of the defendants and their predecessors in office . . . to assign teachers (including substitute teachers) and staff members to schools, . . . so that, in general, the faculty and staff of each school mirrored the racial composition of the school's student body." Such a practice was condemned by the court in Davis v. School District of the City of Pontiac, Inc., *supra,* 443 F.2d at 574 and 576. But more significantly, the practice was impliedly condemned by the Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, *supra,* 402 U.S. at 18, 91 S.Ct. at 1277: "Independent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." The fact that after the Government initiated this suit the

Board of School Commissioners by stipulation agreed to eliminate this policy and assign teachers on a nonracial basis under court supervision will be discussed hereinafter. At this point, we only note that as of 1968, substantial faculty segregation (to match the student segregation—whether *de jure* or *de facto*) was the admitted policy of the Indianapolis school system.

The district court also referred to Board practice concerning construction of additions to existing schools and temporary transportation of students when there was overcrowding prior to any permanent resolution of a given situation, 332 F.Supp. at 667–668 and 669. Further, the court noted that the construction of new schools fitted into a pattern of promoting racial imbalance and isolation, 332 F.Supp. at 668–669. Once again, the general finding of fact as to intent made by the district court is a permissible inference from the evidence presented by the record. There were several instances cited in which additions were built to adjoining schools of opposite racial makeup rather than building a new school between them which would have had a racially mixed student body. It was a similar pattern of construction of additions to existing schools on which the court relied in part in finding *de jure* segregation in United States v. Board of Education, Tulsa County, Okla., *supra,* 429 F.2d at 1256. In addition, the placement and usage of junior high schools was stressed by the Government in its case in chief. In those examples, certain intermediate grade pupils were put into junior high schools with the pupils coming from elementary feeder schools basically of one race makeup even though another elementary school not used for feeding, containing basically pupils of the opposite race, was as close to the junior high school and often was more overcrowded than the feeder schools.

With respect to the district court's findings on the Board's choice of sites for new schools, of particular inter-

est is the fact that the two newest high schools have been constructed in the furthest extremities of the School City, as far as possible from the center city black areas. Although the construction of schools to service these rapidly developing areas was indeed necessary, their location at the most distant points of the School City apparently was viewed by the district court as one further fact from which it inferred a segregatory intent, an inference which we cannot say is clearly erroneous on the record as a whole. As this court said in United States v. School District 151, *supra*, 404 F.2d at 1133, "it does not follow from the absence of a duty to achieve racial balance that a Board may deliberately select sites to achieve racial segregation." Nor, we will add to the foregoing statement, may a Board deliberately but unnecessarily select sites the obvious result of which is the achievement of racial segregation.

Similarly, the Chief Justice's opinion in Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. at 20–21, 91 S.Ct. 1267, emphasized that construction of new schools was one of the most potent weapons in maintaining a segregated school system, both by constructing new schools in white suburban areas far from black residential areas, thus allowing racial separation without significant departure from the often enunciated principles of "neighborhood schools," and by promoting further residential segregation by denoting specific areas as white or black. See also United States v. Jefferson County Board of Education, *supra*, 372 F.2d at 876.

 From the above, we conclude that the findings of the district court are not clearly erroneous, that, in fact, the factors cited by the judge to support the ultimate finding are relevant and significant considerations, not only in our opinion, but also in the opinions of various courts which have dealt with similar cases, and that the inference as to the improper intent which the judge drew from the patterns he saw was proper. As to this last point, we can only emphasize that there are very few cases of school segregation today in which the defendants admit that they had an improper intent. Such intent may then be properly inferred from the objective actions. The district court's opinion refers not only to specific examples but also to aggregate findings: for example, the court stated, "according to the evidence, there have been approximately 350 boundary changes in the system since 1954. More than 90% of these promoted segregation." 332 F. Supp. at 670. See Keyes v. School District No. 1, Denver, Colo., *supra*, 445 F. 2d at 1000. There is substantial evidence to support the inference.[8]

 There is one further contention raised by appellants that we must consider. As noted above, appellants denied both that they had a segregatory intent and that their actions were the proximate cause of the present severe racial imbalance in many of the schools in Indianapolis. The Board argued that whatever patterns of *de jure* segregation existed in the past, today's segregation was *de facto*, if that. Therefore, it is argued, nothing the Board could have done would have prevented such a situation from occurring unless it had rejected the concept of neighborhood schools altogether, something which the courts have not required in the absence of *de jure* segregation. This contention is not easily answered since, as the district court's opinion reflects, other forces both public and private have had significant impact on residential housing patterns in Indianapolis. Arguably, *Brown I* and *Brown II* would still reach such conduct even if the result was clearly inevitable. But we can add that in the

8. We note that such inferences are not unique to this area of the law. The doctrine of "conscious parallelism" in antitrust law involves a similar inference of intent from objective factors. See Antitrust Developments, 1955–1968, at 22–24. See also Littleton v. Berbling, 468 F.2d 389, 408 (7th Cir. 1972).

present case we believe that the district court's finding is not clearly erroneous when it lays at least a substantial part of the blame on defendants and their predecessors and agents. The Supreme Court in *Swann*, as well as many other courts, has recognized that school policy has a substantial impact on residential patterns as well as vice versa. Thus, the appellants are not the victims of the inevitable since their predecessors' actions have contributed in substantial part to the present pattern. Furthermore, even the appellants cannot successfully argue that the marginal cases in racially mixed areas are inevitable. Those schools which might have racially mixed enrollments today but due to the practices found by the district court are either predominantly white or predominantly black are clearly within the Board's responsibility. Finally, it would be improper to allow the Board to follow policies which constantly promote segregation and then defend on the *presumption* of inevitability.

A related consideration is found in appellants' protestations that they have in the last several years taken substantial steps to correct any possible inequities inherited from their predecessors in office. The district court's opinion shows, however, that even after the date the suit was filed, defendants continued in some of the patterns which the court found to be segregatory. Even giving the appellants the benefit of all doubts as to the last few years, we would agree with the court in Davis v. School District of City of Pontiac, Inc., *supra*, 443 F.2d at 575: "However, these same contentions were presented at trial and the

District Court, while acknowledging recent efforts to improve the situation, nevertheless found the new policies inadequate to cure the effects of years of purposeful segregation." Especially as to actions taken after the date on which the suit was filed,[9] as praiseworthy as they may be, such actions go more to the propriety of granting equitable relief rather than to the merits of the district court's findings. We might also note that since 1968, when this suit was filed, the Board has rejected a plan of desegregation propounded at the Board's request by a team of educators from the Office of Education, Department of Health, Education and Welfare. Although there was certainly no requirement that the Board accept the proposal, the unqualified rejection of a similar plan was found to be probative of an improper intent in United States v. School District 151, *supra*, 404 F.2d at 1133.

In sum, this case was tried to a judge who obviously gave it considerable conscientious thought and attention and by able counsel on both sides. We have examined the court's findings of fact and are unable to say the findings are clearly erroneous that during much of the period from 1954 to 1968 the Board continued affirmative policies which promoted a dual system, and that last-minute efforts have been totally insufficient to eliminate the consequences of those years of discrimination. Since the district court's findings of fact are not clearly erroneous, and since the court correctly stated the law based on those findings, the judgment of the district court is affirmed.

Affirmed.

---

9. The integration of Crispus Attucks High School, the desegregation of faculty appointments, and the majority to minority transfer program were adopted only after this suit was filed.