In re AIR CRASH DISASTER AT FLORIDA EVERGLADES ON DECEMBER 29, 1972.

Dorothy GORDON, etc., Joseph Mazur and Rose Mazur, Meryl Adrienne Rubin, etc., Plaintiffs, and Fuchsberg & Fuchsberg, their attorneys, Appellants,

v.

EASTERN AIR LINES, INC., et al., Appellees.

Steve N. MINGUZZI et al., Plaintiffs, and Landes, Wingate & Shamis, their attorneys, Appellants,

v.

EASTERN AIR LINES, INC., et al., and "Plaintiffs' Committee," Appellees.

No. 74–2074.

United States Court of Appeals, Fifth Circuit.

April 4, 1977.

---

Fuchsberg & Fuchsberg, Cyrus M. Diamond, New York City, for Gordon.

Landes, Wingate & Shamis, New York City, for Minguzzi.

Susan Goldman, Miami, Fla., for appellants.

Stanley Jay Bartel, Robert Orseck, Miami, Fla., for appellees.

Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.

GODBOLD, Circuit Judge:

This is a dispute over attorney fees awarded to a small group of plaintiffs' counsel who were designated by the district court as lead or liaison counsel for plaintiffs' side in a massive consolidated multi-district case. The fees were awarded out of fees receivable by other plaintiffs' counsel.

The consolidated case embraced more than 150 claims for death and injuries arising from the crash of a large Eastern Airlines passenger plane near Miami, Florida. The District Court for the Southern District of Florida appointed as "lead counsel" for plaintiffs a "Plaintiffs' Committee," and counsel for the Committee, who between themselves represented 60 plaintiffs.[1] The real appellees in interest are the lawyers composing the Committee and its counsel. While the nominal appellants are persons who were plaintiffs below, the real appellants in interest are two of the law firms required by the court to contribute to the fees of the Committee. None of the parties plaintiff or defendant in the primary litigation is actively involved in this appeal.

Originally the authority of the Committee was limited to leading and coordinating discovery and other pre-trial matters. La-ter it was broadened to include service as lead counsel to prepare and conduct test cases on the issue of liability. The two test cases were never tried. The extensive discovery and pre-trial preparation carried on by the Committee were largely responsible for an ultimate concession of liability by defendant Eastern on the eve of trial and the consequent settlement of many cases. The court awarded compensation to the Committee for their work as lead counsel by ordering each other attorney representing a plaintiff, except those attorneys who had actively participated in the pre-trial activities, to pay to the Committee a part of the fee that he was entitled to receive from his client.

We hold that the district judge had the power to award compensation to the Committee to be paid by other plaintiff counsel out of the fees they were entitled to receive. But we hold that the power was exercised in an erroneous manner, and, therefore, reverse and remand the case for setting of appropriate fees.

On December 29, 1972, an Eastern Airlines jet en route from New York to Miami crashed in the Florida Everglades, killing 96 of its 191 passengers and crew and injuring many others. Many lawsuits claiming damages for death and for personal injuries suffered in this crash were soon filed in Florida state courts, and in federal district courts in New York and Florida, against Eastern Air Lines, Lockheed and the United States government. On April 23, 1973, the United States District Court for the Southern District of Florida appointed a temporary plaintiffs' committee to coordinate and handle discovery in both federal and state courts.

On June 28, 1973, the federal cases were transferred to the Southern District of Florida for consolidated or coordinated discovery by the Judicial Panel for Multi-district Litigation (MDL) pursuant to 28 U.S.C. § 1407. *In re Air Crash Disaster at*

---

1. The district court did not consider it significant whether the Committee was called "lead counsel" or "liaison counsel" or "Plaintiffs' Committee." In the circumstances of the case, we agree. (Also, we refer to "the Committee" without distinguishing between its members and the attorneys authorized as counsel for the Committee.)

*Florida Everglades on December 29, 1972,* 360 F.Supp. 1394 (Jud.Pan.Mult.Lit., 1973). The MDL panel alluded to the coordinated discovery in progress:

> [N]umerous actions have been filed in the Florida state courts and, through the cooperation of the parties and the state and federal court judges involved, discovery proceedings in the state court actions are being coordinated with the discovery in the Florida federal court actions. Transfer of all actions to the Southern District of Florida, therefore, will take advantage of this state-federal accommodation in discovery and will greatly enhance the expeditious processing of all actions arising out of the crash. . . .

*Id.* at 1395–96. After the transfer the District Court for the Southern District of Florida entered an order that the temporary committee would continue until further order of the court. This committee came to be known as the "Plaintiffs' Committee."[2] The court entered no precise instructions defining the Committee's authority but made clear in notices to parties and at pre-trial hearings that the Committee was to coordinate discovery and take the lead in discovery and that all counsel were free to participate in discovery. Only a few other plaintiff attorneys took part in the Committee's discovery efforts, and it is conceded that appellants did not.

At pretrial conferences in September[3] there was discussion of a consolidated trial on the question of liability. On suggestion of counsel, the court attempted to secure consent of all parties to be bound by trial of two test cases. On September 24 it sent to all parties and all crash victims who had not yet filed suit a proposed stipulation for a consolidated test trial on liability, along with a statement that the court approved the stipulation and recommended that all plaintiffs execute it. The proposed stipulation contained this provision concerning fees for lead counsel:

> 10. That plaintiffs and claimants have and will be deriving benefits from efforts of the Plaintiffs' Committee and Counsel authorized by the Court and the Committee [sic] should bear their fair share of repayment of the costs and payment for counsel's skill and time and effort which have been devoted to the common question of liability. After conclusion of the liability trial, this Court, upon application and hearing by all interested parties, shall determine the matter of the fair and reasonable contingent fee and return of disbursements to be paid to the Plaintiffs' Committee and counsel authorized by the Court and the Committee.

Not all plaintiffs joined in the stipulation. At a pre-trial hearing on October 10 the court stated that the Committee was to continue and was to be in charge of preparing and trying the case for the plaintiffs. Also the court twice pointed out that it was of no consequence whether the title given to the Committee and its members was "lead counsel," "liaison counsel," "co-lead counsel," "co-liaison counsel," or "Committee."

On October 18 the court issued an order consolidating the various cases before it pursuant to 28 U.S.C. § 1404 and Rule 42(a), F.R.Civ.P., for a joint trial on liability.[4] The October 18 order "appointed" (actually, re-appointed) the two committee members as liaison counsel and as lead counsel to prepare for and conduct the test trials, and they were authorized to utilize the two counsel for the Committee. See *n. 2, supra.* They were directed to act as spokesmen for all plaintiffs at pre-trial conferences and

---

2. The Committee was composed of three Miami attorneys. A fourth attorney, who practiced in Washington, D.C., was named as counsel to the Committee. Later a Committee member withdrew and was replaced by a second counsel to the Committee. Several attorneys from New York and Boston asked to be added to the Committee, but their requests were turned down.

3. By early September there were more than 40 cases pending in the consolidated MDL case.

4. The district court assumed that as transferee court it could exercise the power to transfer the cases to itself under 28 U.S.C. § 1404. See *Pfizer v. Lord,* 447 F.2d 122 (CA2, 1974). The parties have not raised the question whether this can be done; therefore we do not reach it.

authorized to enter into stipulations as necessary for the liability trial. The order provided:

6. That Plaintiffs and claimants have and will be deriving benefits from efforts of lead counsel and the counsel authorized by the Court and the Committee who have in fact prepared this matter for trial on behalf of the Plaintiffs and who will represent the Plaintiffs in the trial of this matter. After conclusion of the necessary trial, this Court, upon application and hearing by all interested parties, will determine the matter of fair and reasonable contingent fees and return of disbursements to be paid to lead counsel and to the counsel authorized by the Court who have conducted the pre-trial discovery and preparation and who will conduct the trial on behalf of the Plaintiffs.

. . . . .

9. No settlement of any claim or judgment of dismissal based upon a settlement will be approved as to any of these related civil actions or claims without a showing that such Plaintiff or claimant has reimbursed said participating and lead counsel for expenses and services and no sum of money proceeds shall be paid by any defendant on any settlement without prior approval of this Court.[5]

On November 16, ten days before trial was scheduled to begin, the defendant Eastern conceded liability, and the defendants Lockheed and the United States agreed to contribution toward the payment of claims without conceding liability. With these stipulations by the three defendants, trial on the issue of liability became unnecessary and the parties began to negotiate settlements.

The court set for hearing the matter of attorney fees, directed the Committee to submit to the court and all counsel "a detailed list of expenses incurred and such other data as they deem necessary," and requested from other plaintiff counsel recommendations with respect to the computation of fees. Committee members and the two committee counsel submitted and served on other plaintiff counsel written statements describing their respective services and listing expenses totalling $60,411.11. They requested a fee of 10% of the settlements received by plaintiffs other than those by whom they had been retained. Numerous counsel filed objections and briefs at the hearing held on November 30. No testimony was taken but numerous counsel orally argued.[6] On December 5 the court entered its order awarding the Committee and counsel a fee of 8% of the settlement obtained by each plaintiff who had retained counsel not a member of the Plaintiffs' Committee, payable out of the fee of the attorney for each such plaintiff. The 8% payment was to include the $60,411.11 expenses incurred by the Committee. This fee was 8% of what was then and is now an unknown amount of total damages recov-

---

5. Later the order was changed in several respects. Settlements made before September 24 were excluded. (This was the date on which the court had sent out the proposed stipulation in which for the first time reference was made to attorney fees for lead counsel.) Payment of settlements up to 90% was permitted, with the balance of 10% to be held in escrow. Claimants who had not retained counsel were excluded from payment of the fee.

In three of the cases in this appeal, a number of claimants who had retained counsel but had not filed suit challenged the authority of the district court to assess a fee against their settlements entered into after September 24 but prior to Eastern's concession of liability on November 16. These appeals were settled prior to oral argument, and we accordingly do not specifically consider the authority of the dis-

trict court to assess a fee in cases not formally before it.

6. Some of the points urged by them were: no fee should be awarded; no contingent fee should be awarded; only a quantum meruit award would be appropriate; the data furnished by Committee members and counsel was insufficient and covered periods before their appointment; plaintiffs retained by the Committee members and their counsel should share in paying the fee and the expenses; and a flat percentage fee award would bear disproportionately on lawyers with differing contingent fee arrangements. Counsel from New York stated that their contingent fee contracts were limited by New York requirements to a lesser percentage than the contracts of some of the other lawyers for plaintiffs.

ered by some 80 plaintiffs (not including the 60 clients of members of the Committee). The 8% was not to be an additional expense to each plaintiff but was to be taken from his retained lawyer's fee.

The rationale of the district judge was threefold. He considered that his approach was a necessary incident to achievement of the goals of multidistrict litigation; he found that the Committee had performed duties beyond their responsibilities to their own clients; and he relied upon *Sprague v. Ticonic National Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), the leading "equitable fund" case. With respect to the first the court stated:

> Obviously, the Court's conclusion effectuates a deduction from the amount of attorneys fees originally contemplated by an attorney at the time of his undertaking representation of a claim. Yet, if the laudable purposes of statutory law pertinent to multidistrict litigation are to be achieved, some expectations must necessarily remain unfulfilled, at least in part. The goal of the expeditious processing of all actions arising from a common disaster—each claim for relief being a potentially protracted case—can only be accomplished by avoiding duplicitous discovery, conflicting contemporaneous rulings by coordinate district and appellate courts, and fostering the convenience of parties and witnesses.

With respect to the Committee's extra duties and responsibilities the district judge held:

> Being intimately involved with the progress of this litigation, however, the Court remains singularly unimpressed with the position that the Plaintiffs' Committee and its Authorized Counsel will be receiving a "bonus" or be unjustly enriched by this Court's awarding attorney fees of the type requested by appointed counsel. Delegated with the responsibility of preparing and prosecuting an action, on behalf of all plaintiffs, replete with complex case, statutory and regulatory law, and opposed by formidable defense counsel, the appointed counsel had to completely disassociate themselves from any responsibilities to other clients. Their initiation of proceedings for the production of, and consequent actual inspection of voluminous documents, the training facilities of defendant EASTERN AIRLINES, INC., and the radar room of Miami International Airport; their initiation and conduction of the examination of twenty-six (26) witnesses in liability depositions; their committee conferences to analyze the discovered information for use in pretrial proceedings and preparation for trial; their preparation of legal memoranda in support of the plaintiffs' position in opposition to defendants' motion; their diligently informing the Court of the status of the litigation and their recommendations for expediting it; their attendance at, and participation in, numerous judicial hearings; all of the foregoing activities on the part of the four counsel involved are well documented.

> After careful scrutiny of such conscientious execution of appointed counsels' preparation of the plaintiffs' case, this Court is constrained to observe that if, in fact, an element of unjust enrichment exists in the Court's percentage award of attorneys fees, the beneficiaries are the attorneys whose time was not so consumed in the manner outlined above, but who shall receive all but eight percent (8%) of the attorneys fees originally contemplated by them.

The order invited applications from any plaintiffs' attorneys who claimed special circumstances that should exclude them from the 8% contributions. Applications were made by some attorneys and were granted. Appellants made no application.

Not all claims had been settled when the case was argued to us. The parties vigorously contest what the 8% fee will produce. The Plaintiffs' Committee estimates $275,-000; the appellants estimate $2–4 million.

The appellants do not challenge the power of the court to appoint counsel to per-

form duties such as were assigned in this case but only its power to order that "lead counsel" be paid out of the fees of employed attorneys. Appellants approach the case as though it were purely a private contest over fees between competing lawyers. This approach is a nostalgic luxury no longer available in the hard-pressed federal courts. It overlooks the much larger interests which arise in litigation such as this. Each case in the consolidated case was private in its inception. But the number and cumulative size of the massed cases created a penumbra of class-type interest on the part of all the litigants and of public interest on the part of the court and the world at large. The power of the court must be assayed in this semi-public context.

■■■ A trial court has managerial power that has been described as "the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153, 158 (1936).[7] See also reference in *MacAlister v. Guterma*, 263 F.2d 65, 69 (CA2, 1958), discussed *infra*, to

"the traditional exercise of the court's inherent powers over the administration and supervision of its own business." Managerial power is not merely desirable. It is a critical necessity. The demands upon the federal courts are at least heavy, at most crushing. Actions are ever more complex, the number of cases greater, and in the federal system we are legislatively given new areas of responsibility almost annually. Our trial and appellate judges are under growing pressure from the public, the bar, the Congress and from this court to work more expeditiously. In most instances these pressures reflect fully justified societal demands. But court resources and capacities are finite. We face the hard necessity that, within proper limits, judges must be permitted to bring management power to bear upon massive and complex litigation to prevent it from monopolizing the services of the court to the exclusion of other litigants.[8] These considerations are at the heart of steps to create procedures for handling complex litigation. The Manual for Complex Litigation (rev.ed. 1973) (formerly the Manual for Complex and Multidistrict Litigation but assigned a new title in recognition of its usefulness in all complex litiga-

---

**7.** *Landis* held that a district court has the power to stay one case pending the outcome of another case with different parties, but that the judge had abused his discretion under the circumstances.

**8.** In class actions we recognize, indeed insist upon, the court's participation as the manager of the case. *Huff v. N.D. Cass Co.*, 485 F.2d 710, 713 (CA5, 1973) (en banc). See also *Amos v. Board of Directors of City of Milwaukee*, 408 F.Supp. 765, 774 (E.D.Wis.), *aff'd sub nom. Armstrong v. Brennan*, 539 F.2d 625 (CA7, 1976); *Forbes v. Greater Minneapolis Area Bd. of Realtors*, 61 F.R.D. 416, 417 (D.Minn., 1973). Fed.R.Civ.P. 23(d) grants particularly broad powers to a court in managing a class action:

"(d) *Orders in Conduct of Actions.* In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the mem-

bers of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors; (4) requiring that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons, and that the action proceed accordingly; (5) dealing with similar procedural matters. The orders may be combined with an order under Rule 16, and may be altered or amended as may be desirable from time to time."

Under the authority of this section courts have utilized a variety of techniques in managing class actions. 7 C. Wright and A. Miller, Federal Practice and Procedure, §§ 1792–1797 (1972); 3B Moore's Federal Practice ¶¶ 23.70–23.80 (1975), including the appointment of lead counsel. *Percodani v. Riker-Maxson Corp.*, 51 F.R.D. 263 (S.D.N.Y., 1970), *aff'd sub nom. Farber v. Riker-Maxson Corp.*, 442 F.2d 457 (CA2, 1971). *Cf. Fields v. Wolfson*, 41 F.R.D. 329, 330 (S.D.N.Y., 1967).

tion), commences with these statements in the Foreword:

> In the last twenty years every successful profession and business has been compelled to develop and employ revolutionary methods of research, planning and operations to serve an increasing population and the current revolution in science, technology, transportation, communications, education and industry.

> In this revolutionary age the rising flood of litigation in the courts of the United States and of the several states has nearly overwhelmed the Bench and Bar. Civil filings in the federal courts have increased rapidly; and despite recent additions to the number of federal judges the backlog of pending cases has continued to grow.

> . . . . .

> It is certain that complex and multidistrict litigation will increase. Therefore, if the administration of justice by the courts is to endure, the Bench and Bar must devise and employ new procedures which will increase the efficiency and improve the quality of justice without increasing the burden on litigants.

Manual for Complex Litigation (rev. ed. 1973), p. III [hereafter "Manual"].

> . . . Both the bench and bar have long been in nearly unanimous agreement on the fundamental principal that a complex case must be managed by a judge with a firm hand. It is counsel who must conduct discovery and make stipulations, but "[t]he person who must insure that a case of this nature is thoroughly prepared prior to trial is the trial judge himself . . . . Without a firm attitude on the part of the judge no measure for minimum volume, expense and delay will be effective." Prettyman Report, 13 F.R.D.

65–66 (1951). See also Handbook, 25 F.R.D. 351 (1960).

*Id.* § 1.10, pp. 13–14.

■ The trial court's managerial power is especially strong and flexible in matters of consolidation. Fed.R.Civ.P. 42(a) provides:

> *Consolidation.* When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and *it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.* [Emphasis added.]

This is a broad grant of authority, particularly in the last clause. And the rule has been applied liberally.

■ A court may order the consolidation of cases despite the opposition of the parties. *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285, 293, 12 S.Ct. 909, 36 L.Ed. 706, 709 (1892); 5 Moore's Federal Practice ¶ 42.02 at 42–7 n. 4 (1976).[9]

"In this Circuit, district judges have been 'urged to make good use of Rule 42(a) . . . in order to expedite the trial and eliminate unnecessary repetition and confusion.'" *Gentry v. Smith,* 487 F.2d 571, 581 (CA5, 1973), quoting *Dupont v. Southern Pacific Co.,* 366 F.2d 193, 195 (CA5, 1966), *cert. denied* 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 106 (1967). Rule 42(a) "is permissive and vests a purely discretionary power in the district court. 'An exercise of such power may be reviewed on appeal from a final judgment or order but will not be disturbed except for abuse of discretion.'" *Whiteman v. Pitrie,* 220 F.2d 914, 918 (CA5, 1955). *Accord, NAACP v. Michot,* 480 F.2d 547 (CA5, 1973); *Davis v. Yellow Cab Co.,* 220 F.2d 790 (CA5, 1955) ("the trial court had a large discretion in the matter which will not be interfered with except in a clear case of abuse").[10]

---

**9.** It would therefore seem that the ancillary procedure of appointing lead counsel may also occur over the objection of some parties. Under the cases, the principal limitation on Rule 42 power is that the court must avoid prejudicing the rights of the parties. The "rights" of attorneys, as such, have not previously been held relevant at all to the question whether cases should be consolidated.

**10.** Reversals for abuse of discretion are rare. Most are holdings that consolidation prejudiced the rights of one party because his substantive legal interests differed from those of his co-party. *E. g., Dupont, supra.* No one claims that there was any such divergency among plaintiffs' interests in the instant case.

The need for a court to exercise its inherent managerial powers as expressed in Rule 42(a) may take precedence over desires of counsel. For example in *Walker v. Loop Fish & Oyster Co.*, 211 F.2d 777 (CA5, 1954), this circuit took the view that Rule 42 and its policy against waste of judicial resources can take precedence over individual counsel's desires that litigation follow its normal and full-blown course. *Walker* involved six tort actions arising from the same automobile collision and pending before the same judge. One case, the only one in which a jury had been demanded, went to trial first.

> Before commencing the jury case, the district judge notified counsel in these cases that in order to avoid needless repetition, all evidence on the question of negligence taken in the jury case would be "incorporated" in the non-jury cases, but that the parties to the non-jury cases could introduce in those cases any additional evidence they desired on the question of negligence. The trial court further notified plaintiffs in the non-jury cases (appellants here) that they could fully participate in the jury case, which was done.

*Id.* at 780. The defendant won across the board. On appeal, this court affirmed, viewing the judge's procedure as, in effect, a Rule 42 consolidation on the negligence issue:

> It would have been a work of supererogation, and a needless waste of time, for the trial judge to have again heard in the non-jury cases the lengthy evidence on the question of negligence which he had just heard eleven days before, in the jury case. Rule 42 was designed to relieve against just such situations. There is no showing that appellants were denied the

right to introduce any evidence they desired to introduce.

*Id.* at 780–81.

■ It is not open to serious question that a federal court in a complex, consolidated case may designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide. *MacAlister v. Guterma*, 263 F.2d 65 (CA2, 1958), is perhaps the leading case on the court's power to appoint and rely on lead counsel.[11] Chief Judge Kaufman's opinion contains these pertinent passages on the issue of judicial power:

> The purpose of consolidation is to permit trial convenience and economy in administration. Toward this end Rule 42(a) in addition to providing for joint trials in actions involving common questions of law and fact specifically confers the authority to "make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." Certainly, overlapping duplication in motion practices and pre-trial procedures occasioned by competing counsel representing different plaintiffs in separate stockholder derivative actions constitute the waste and inefficiency sought to be avoided by the lucid direction contained in the rule.
>
> . . . An order consolidating . . actions during the pre-trial stages, together with the appointment of a general counsel may in many instances prove the only effective means of channeling the efforts of counsel along constructive lines and its implementation must be considered within the clear contemplation of the rule.
>
> .　.　.　.　.
>
> . : . It would be anomalous indeed if the use of consolidation before trial

11. *MacAlister* involved three stockholders' derivative suits. The district court denied the defendant's motion to consolidate the cases and appoint general counsel. On appeal the Second Circuit held that the judge had possessed the power to grant the motion, but had properly exercised his discretion to deny it because equally efficient alternatives to consolidation existed and there was significant friction among the plaintiffs.

were excluded from the mounting arsenal of pre-trial devices now made available to the trial judge. By denying the power of the district court to consolidate actions in and for the pre-trial stages we would in effect be marking time while judicial administrative reform in other areas pushed forward. Such judicial retrenchment is not compelled either by the clear wording of Rule 42 or by the traditional exercise of the court's inherent powers over the administration and supervision of its own business.

. . . . .

. . . The advantages of this procedure should not be denied litigants in the federal courts because of misapplied notions concerning interference with a party's right to his own counsel.

*Id.* at 68–69.

In *Farber v. Riker-Maxson Corp.*, 442 F.2d 457 (CA2, 1971), the district judge designated lead counsel for all plaintiffs in a consolidated case and directed that all pleadings and notices be issued by or served upon them, and specified that the trial of the consolidated action should be conducted on behalf of plaintiffs by lead counsel with leave to other plaintiffs' counsel to participate to such degree as the court might determine. Another plaintiff attorney, over the objection of lead counsel, sought to file a motion for summary judgment without asking leave of court. The Second Circuit held that he was free to ask the court for leave but noted that the limiting order was not inconsistent with the proper function of lead counsel and did not deny the nonlead attorney an appropriate opportunity to participate in the litigation.

This circuit has accepted the concept of use of lead counsel. In *Pearson v. Ecological Science Corp.*, 522 F.2d 171 (CA5, 1975), *cert. denied sub nom. Skydell v. Ecological Science Corp.*, 425 U.S. 911, 96 S.Ct. 1508, 47

L.Ed.2d 762 (1976), we rejected several attacks on a settlement agreement reached by co-lead counsel on behalf of all plaintiffs in a consolidated action. Co-lead counsel had acted on the strength of a district court order providing: " 'All other pleadings, including but not limited to stipulations and the making of all opposition to any motion, shall likewise be initiated and conducted by co-lead counsel on behalf of all plaintiffs subject to consultation by them with additional counsel representing specific plaintiffs.' " *Id.* at 173. The district court had found that this order had authorized the settlement activities. We held this was not clearly erroneous, thus implicitly acknowledging the validity of co-lead counsel's authority.[12]

A common air disaster is a classic case for complex litigation techniques. *Cf. Manual* § 0.22. The *Manual* sets out recommended procedures for complex cases. It does not create rights nor does it bind judges to the procedures recommended.

Section 1.90 provides for selection of liaison counsel by the parties or the court. Where there are numerous parties on one or both sides of the case, and liaison counsel is appointed to perform duties previously administrative or procedural it is contemplated that he be reimbursed by the parties for his services. *Id.* Section 1.92 provides for lead counsel and steering committee whose pre-trial duties for groups of parties having a common interest are more substantive—briefing and arguing motions, writing interrogatories, arranging for and conducting depositions. It suggests that where appropriate the court should designate lead counsel for trial if the parties have not agreed on him. The steering committee is proposed, by § 1.92, to provide leadership for large groups of parties and to exercise coordination.

**12.** In his order of appointment in *Pearson* the district judge ordered co-lead counsel to file a consolidated amended complaint on behalf of all plaintiffs. The propriety of this procedure was apparently not challenged on appeal and not questioned by the panel. While in *MacAlister* the Second Circuit had specifically stated that district courts have no such power, 263 F.2d at 69, the Second Circuit now appears to have retreated somewhat from its earlier position. *Katz v. Realty Equities Corp.*, 521 F.2d 1354, 1360 (CA2, 1975). *Accord: In re Equity Funding Corp. of Amer. Sec. Litigation*, 416 F.Supp. 161, 176 (N.D.Cal.1976).

■ In this instance the district judge merged in the Plaintiffs' Committee the suggested procedures of § 1.90, concerning liaison counsel, and of § 1.92, concerning lead counsel. This kind of innovative approach is contemplated by the Manual:

This Manual is designed also to stimulate the devising of procedures appropriate in solving new problems as they arise. It is intended to be a living document into which desirable techniques proved by experience will be incorporated in the future. Rarely does complex litigation follow a set pattern. Accordingly, flexibility should be the keynote in applying the suggestions contained in this Manual.

Manual p. XIV. The judge was not concerned with whether the Committee was given the title of "lead" or "liaison" or something else. That part of his October 18 order forbidding implementation of settlements without payment to lead counsel was drawn directly from the language of § 1.90 and the sample order for appointment of liaison counsel. *Manual, Appendix of Materials*, § 1.90 pp. 177–78.

Section 1.92 does not refer to payment for lead counsel. This is of no moment. Neither § 1.92 nor § 1.90 is a grant of power or a limitation. However, § 1.90's recognition of power in the court to order compensation to one titled liaison counsel implies power to pay counsel carrying the more significant duties and responsibilities of lead counsel.

While recognizing the need for lead counsel, and the power of the court to appoint such counsel, appellants say that the Committee must work without any compensation other than that coming from their own clients. We hold that the district court had the power to direct that the Committee and its counsel be compensated and that requiring the payment come from other attorneys was permissible.

First, if lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation. What can happen, although it did not in this instance, is described by a practitioner experienced in air crash litigation:

Liaison counsel begins discovery without benefit of any order or rule defining specifically his rights or duties and without the comfort of any order or arrangement covering sharing costs or compensation. For this reason he does not feel bound by any particular obligation to any other counsel, he pursues his own discovery primarily for his own benefit and without particular concern for the interest of needs of other parties.

Beatty, *The Impact of Consolidated Multidistrict Proceedings on Plaintiffs in Mass-Disaster Litigation*, 38 J. of Air L. & Com. 183, 188 (1972). The interests to be served are too important to be left to volunteers (or draftees) who are unpaid in the sense that they get nothing additional. The limitations of relying upon unpaid lead or liaison counsel are demonstrated by the history of the application of complex litigation techniques to air disaster cases. The authors of the *Manual* assumed that application of its techniques would expedite and simplify pre-trial proceedings including discovery. However, in the area of air crash litigation critics challenged whether the procedures could lead to any significant economies. Note: *The Judicial Panel and The Conduct of Multidistrict Litigation*, 87 Harv.L.Rev. 1001, 1006–07 (1974). Even strong supporters of the multidistrict litigation concept were dismayed by the inefficiency of discovery procedures. A former executive attorney of the Judicial Panel for Multidistrict Litigation wrote, "Discovery may have become the 'monster' of multidistrict litigation. Even allegedly 'uncomplicated' aviation litigation discovery programs frequently last up to two years and involve many months of taking depositions and the production and review of thousands of documents." McDermott, *A Modest Proposal for Expanding The Authority of The Judicial Panel on Multidistrict Litigation*, 38 J. of Air L. & Com. 171, 178 (1972). One of the specific criticisms voiced by Beatty, *su-*

*pra,* was that the lack of formal guidelines and compensation for liaison counsel might lead to inadequate discovery and incomplete flow of information.

The drafters of the *Manual* were responsive to this criticism. Among other changes they provided in the 1973 edition of the *Manual* for compensation of liaison counsel, *Manual* § 1.91, and for the designation of "lead" counsel who would have greater responsibilities than had been previously allocated to "liaison counsel." § 1.92. One commentator has said of the case before us:

> Initially under the Multi-District Panel there were instances where pre-trial discovery was excessive and extended over long periods of time. More recent experience has shown that discovery under the multi-district procedure can be handled expeditiously and to the benefit of all parties. I am informed that through consolidation pursuant to section 1407, discovery in the recent air crash disaster in the Florida Everglades was conducted and concluded in a matter of months, which attests to the desirability of the procedure.

Rox, *Discovery Against Air Carriers,* 40 J. of Air L. & Com. 469, 476 (1974).

The principles underlying use of lead and liaison counsel are blurred in this case by the Committee members, having 60 cases of their own. Appellants ask, "why pay them for doing what they would have done anyhow on behalf of their own clients?" This is too simplistic. It is uncertain that appellants or any other plaintiff lawyers would have been able to conduct prompt, orderly, precise and fruitful discovery if there had been a multitude of diligent lawyers pushing for the front seat and the maximum advantage. The Committee members' 60 cases may affect the amount paid them as lead counsel but not the power of the court to require payment. In the next case the best available lead counsel may have one case out of 100.

The argument that lead counsel are paid twice for the same work overlooks what the district court did not overlook—the broader responsibilities that lead counsel bear and the larger interests that they serve. Because of the nature of the case that will trigger appointment, lead counsel's services are in part for all parties with like interests and their lawyers. To a degree, lead attorneys become officers of the court. By making manageable litigation that otherwise would run out of control they serve interests of the court, the litigants, the other counsel, and the bar, and of the public at large, who are entitled to their chance at access to unimpacted courts.[13]

The power of the court to order compensation, and payment of it in the manner directed in this case, is reinforced by the body of law concerning the inherent equitable power of a trial court to allow counsel fees and litigation expenses out of the proceeds of a fund that has been created, increased or protected by successful litigation. This expanding jurisprudence has moved beyond the literal limits of its original bounds.[14]

*Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1881) is the headwaters American case. A trust estate had been collusively dissipated by its trustees. One of the trust's beneficiaries, acting alone and bearing his own costs, labored 11 years in litigation to recover the estate's looted assets and in addition to secure damages. These sums were paid into the trust by the malfeasant trustees and accepted by all other beneficiaries of the trust. The Supreme Court held that the residue of the estate which was being administered under the trial court's direction by an appointed receiver could be properly used to compensate the laboring beneficiary for his costs, including attor-

---

**13.** The discovery that led to Eastern's conceding liability was carried out between around August 1 and November 16. It is impossible to say how long, without coordinated control, the discovery process would have taken. Since there were more than 150 claims the prospects for speed were not good.

**14.** For an unsympathetic but full history, *see* Dawson, *Lawyers and Involuntary Clients: Attorney Fees From Funds,* 87 Harv.L.Rev. 1597 (1974).

ney's fees. The Court noted that the fees of the trustees (had they properly administered the trust) would be chargeable to the trust under the familiar rule that a trust must bear the expenses of its own administration. The beneficiary seeking compensation had simply performed the trustees' duty. To deny him contribution from the other beneficiaries

> would not only be unjust to him, but it would give to the other parties entitled to participate in the benefits of the fund an unfair advantage. He has worked for them as well as for himself . . . [t]hey ought to contribute their due proportion of the expenses which he has fairly incurred. To make them a charge on the fund is the most equitable way of securing such a contribution.

105 U.S. at 532, 26 L.Ed. 1160. Four years later, in *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885), attorneys were permitted to directly assert their claim for compensation beyond that paid by their client for services provided to inactive class members. Part of the rationale of the Court was, as in *Greenough,* that it was fair to require payment by those who accepted the fruit of the labor of others.

The best-known case is *Sprague v. Ticonic National Bank, supra,* written by Justice Frankfurter and cited by the district judge in his order granting the fee in this case. The suit was not a class action. The claim for reimbursement of fees was made by the client. The fund was identifiable, consisting of earmarked bonds in the trust department of a bank in receivership under the aegis of a federal court. Perhaps more significant than the decision is the language explaining that the award of fees in a fund case is rooted in the inherent powers of equity:

> Plainly the foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional taxable costs is part of the orig-

inal authority of the chancellor to do equity in a particular situation. Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for his costs in producing it. But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation—the absence of an avowed class suit or the creation of a fund, as it were, through *stare decisis* rather than through a decree—hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation.

307 U.S. at 166–67, 59 S.Ct. at 780, 83 L.Ed. at 1187.

■ In the present case there is not a fund in the sense of identified items already in the hands of a court appointee, but this is not a necessity. Determination of whether a fund exists is a combination of traditional and pragmatic concepts centering around the power of the court to control the alleged fund. A trust estate, whose only nexus with the court may be that the trustee is a party to the suit, is a fund. Dawson, *Lawyers and Involuntary Clients: Attorney Fees From Funds,* 87 Harv.L.Rev. 1597, 1615 (1974) (hereafter cited as "Dawson"). A decedent's estate is a fund. *Id.* Potential rebates segregated on the books of a utility pursuant to a court order are a fund. *Washington Gas Light Co. v. Baker,* 90 U.S.App.D.C. 98, 195 F.2d 29 (1951).

■ The district court in this case exercised control of the monies involved in all suits pending before the court.[15] The order of October 18 provided that lead counsel would be paid, and it forbade defendants from paying proceeds of any settlement without court approval, which would be forthcoming only when it was shown that the recipient had paid lead counsel. The funds were as tightly controlled as if in the hands of the clerk of the court.[16]

---

**15.** See n. 5, *supra,* with respect to claims on which suit had not been brought.

**16.** "[A] court's reach or 'control,' though vital, can take many forms. The control can be

Without a doubt many of the settlements, particularly for death claims, would have to be paid into various courts over the country, or their appointees, and disbursed upon orders of the courts. Normally such a court would have the power to fix compensation between competing attorneys. In a practical sense the District Court for the Southern District of Florida was the only tribunal that could effectively handle the fee matter. It would have been unfeasible and irrational, and demeaning to the authority of the appointing court, to remit the Committee to appearing all over the country in each of the numerous probate and like courts under whose authority administration of settlement monies would be handled, to present prayers for compensation.

In many common fund cases those assessed a fee are persons who have not employed lawyers. Dawson, *supra,* at 1597. In this case the court order did not attempt to reach this group, so the power to do so is not an issue. One who hires and pays his own lawyer is not a free rider if the attorney is a contributor to the final results. The district judge recognized this by excluding from the 8% contributions attorneys who continued to be active. Appellants were not in this group. The "separate counsel" argument against award of fees is also based upon the unfairness of the claim-

ant's having to pay twice for legal services. That did not happen in this case.[17]

The unusual feature of the present case compared with most common fund cases is that the payment was directed to be made by the retained lawyers. This is not as startling as at first glance. The court could have required that all settlements be paid into court and that lead counsel file claims for services. Before approving any settlement the court could have ruled on the competing claims of client, employed counsel and lead counsel to the total proceeds. It could have charged the client's portion with the 8% and then granted the client an equivalent credit on his contingent obligation to the retained lawyer who had shared in the benefits of the Committee's work. The court took the more direct route to the same result.[18]

Because the payment was assessed against the attorneys this case does not quite fit in the equitable fund cases. It need not precisely fit. *Greenough* and its progeny are largely private sector cases. They do not involve the larger interests which we have described, whose vindication commands affirmative intervention by the court and the assignment of additional responsibilities to some attorneys, inuring to the benefit of other attorneys.

---

remote or indirect, it can work through intermediaries who are obedient to instructions or who in the last resort can be coerced. Central, of course, is authority to adjudicate the rights and duties of interested parties. The tests of control must be expansive because of the variety and complexity of the tasks involved. For the declared object is to redistribute the costs of litigation in fair proportion to the benefits to strangers that it produces. What is important is the sufficiency of the means, not the form they take."

Dawson, *supra* n. 14, at 1618.

17. In *In re Estate of Korthe,* 9 Cal.App.3d 572, 88 Cal.Rptr. 465 (1970), the court held the common fund doctrine is inapplicable where the beneficiary has his own lawyer, noting that the lawyer doing the lion's share of the work must protect himself by making his own arrangements with other counsel who will eat at the table of success. In a case like the one before us the lead counsel are not free to strike their own bargains but work under the court's order.

18. Courts take innumerable kinds of actions that directly affect not merely cases in the abstract but lawyers and their pocketbooks. The court schedules trials and hearings to meet its needs though the economics of law practices might make other settings more desirable to counsel. The court requires the attorney be present at motion dockets and hearings though he deems his presence unnecessary. Though an attorney has a conflicting engagement the court may decline to postpone his case, necessitating his associating other counsel to handle one of the two commitments. A trial may move along at what counsel consider too slow a pace, so that what looked like a reasonable fee may turn into a financial loss. Without any questioning of their power, courts direct counsel to write additional briefs and to furnish copies of opinions of other courts, to appear for oral arguments though they desire to submit on briefs, and to prepare pre-trial orders and suggested findings.

Arguably, plaintiff counsel—such as the appellants in this case—who elected not to participate in the pre-trial activities and accepted the benefit of the Committee's work impliedly consented to the fact and the manner of payment. See *Doherty v. Bress,* 104 U.S.App.D.C. 308, 262 F.2d 20 (1958), *cert. denied* 359 U.S. 934, 79 S.Ct. 649, 3 L.Ed.2d 636 (1959). But we prefer not to rest our decision on that artificial ground. It would tend to force non-lead counsel to participate although one of the ends is participation by a limited number of attorneys.

The compensation procedures employed in this case are not new to air disaster litigation. Several district courts have employed similar methods. In this case the court drew on *Hartland v. Alaska Airlines,* MDL Dkt. No. 107 (N.D.Cal., 1973), in which the district judge supervised pre-trial proceedings in 35 consolidated cases arising from a 1971 air crash near Juneau, Alaska. In an order regarding discovery he appointed liaison counsel for plaintiffs and a "Discovery Committee on Liability" for plaintiffs. The Committee, like the Committee in the instant case, was assigned the task of conducting discovery on the issue of liability. With respect to their compensation, the court noted:

> That the costs of this type of litigation are inordinately and unpredictably great, and the legal skills required of plaintiffs' counsel in such cases are prodigiously exacting for preparation and for trial on the question of liability.
>
> That it is fair and just that those who are deriving benefits from efforts of counsel inuring to the benefit of all claimants resulting from the death of passengers should bear their fair share of repayment of the costs and payment for counsel's skill and time and effort which have been devoted to the common question of establishing liability, but that the court is unable at this time, in view of the presently appearing necessity of requiring a trial on the question of liability, to make a determination of, or establish a formula

for determining, the percentage, or the amount, that should be contributed to a common fund for the payment of such common services or the repayment of such common costs, but, that it is in the interest of justice that such a fund be established and maintained in the Clerk's office so that at the conclusion of the cases arising from said aircrash, or at such other time as may be appropriate, the Court will be able to make a just and fair distribution of such fund. At the time of distribution, consideration will be given to the contribution of time and skill of, and costs advanced by, all counsel to the issue of liability, and to the total expenditure of any costs by all counsel, and all other factors which bear upon a fair and just distribution of fees and costs on the question of liability.

Other portions of the order provided for reimbursement of liaison counsel for their discovery expenses, and noted the probable need for assignment of lead counsel to conduct the trial on the liability issue, and advised counsel to agree on and recommend to the court "a formula for contribution among the plaintiffs for compensation of such team and lead counsel."

In *In re Air Crash Disaster Near Hanover, New Hampshire,* MDL Dkt. No. 43 (D.N.H., 1972), the court allowed for an allocation of "expenses for discovery, preparation for trial, and trial," for the benefit of both lead and liaison counsel. Lead counsel tried a test case which lasted approximately a week. Lead counsel submitted bills for their services and expenses, pre-trial and trial. The court reduced the amount by 10% to more closely approximate the fair value of the services, and the plaintiffs were assessed for this sum in proportion to their relative recoveries.

More recently, the court in another air disaster case, *In re Multi-District Litigation Against Eastern Air Lines,* 68 F.R.D. 346, 348 (W.D.N.C., 1975), appointed a plaintiffs' committee with sole authority to coordinate and carry out all pre-trial discovery proceedings but reserved the right of noncom-

mittee attorneys to participate in discovery. *Id.* at 348. With respect to compensation the court observed: "Compensation to the members of the plaintiffs' trial committee shall be dealt with by later orders of court." *Id.*[19]

■ The standards for setting fees in this circuit have been set out in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–720 (CA5, 1974), and followed many times since that decision. The district court must set and conduct a hearing in the full sense of the word and must address the fee issue under the *Johnson* standards. The Committee and its counsel must offer relevant evidence and must be available for cross-examination. The court should enter findings of fact and conclusions of law setting out the basis for the fee award and adequately presenting the issue for further appellate review should this be necessary.[20]

AFFIRMED in part, VACATED in part, and REMANDED for further proceedings.

**19.** See also *Abrams v. Occidental Petroleum Corp.*, 44 F.R.D. 543, 548 (S.D.N.Y., 1968), an action in which four suits under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), were consolidated. The court appointed general counsel and added: "There shall be reasonable compensation for the services of general counsel in an amount to be fixed by the Court; and said amount shall be payable by such parties and in such proportions as the Court shall determine after appropriate hearing." The case does not rely on, or even cite, *Sprague.*

**20.** On remand, as a threshold matter, the district court must determine the status of the 8% charges made against plaintiff counsel who have not appealed. We do not know whether these funds have been paid to the Committee or remain in escrow. We do not know the terms of the escrow arrangement. If funds are still in escrow, the record does not give us enough information to consider whether our decision affects funds paid in by plaintiff counsel who have not appealed. The issues arising from money paid out versus money still in escrow, and from appeals by two plaintiff firms but not by others, must be faced by the district court in the first instance.